THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACQUELINE POWELL            :
                                :
              **Plaintiff,**        :
    **v.**                      :     **3:22-CV-01045**
                                :     **(JUDGE MARIANI)**
**BOSCOV'S DEPARTMENT**     :
**STORE, LLC,**               :
                                :
           **Defendant.**     :

## MEMORANDUM OPINION

### I. INTRODUCTION

Before the Court is Defendant's Motion for Summary Judgment (Doc. 18). Defendant Boscov's Department Store, LLC ("Defendant") seeks summary judgment on Plaintiff Jacqueline Powell's claims relating to the termination of her employment. (Compl., Doc. 1.) For the reasons that follow, the Court will grant summary judgment with respect to Plaintiff's confidential medical information claim contained within Count I of her Complaint (*id*. ¶ 62) and deny the remainder of Defendant's Motion for Summary Judgment.

### II. STATEMENT OF UNDISPUTED MATERIAL FACTS

This action arises out of a dispute over Defendant's alleged failure to accommodate and termination of Plaintiff from her employment. Defendant has submitted a "Statement of Undisputed Material Facts" ("SOF") (Doc. 18-8) as to which it submits that there is no genuine issue or dispute. Plaintiff has responded by offering a "Counterstatement of

Material Facts" ("RSOF") (Doc. 22-19) as to which she contends that there remain multiple

disputed issues of material facts. Plaintiff also files a "Statement of Additional Material Facts

Precluding Summary Judgment" (Doc. 22-20).

> Pursuant to Middle District of Pennsylvania Local Rule 56.1:
>
> A motion for summary judgment filed pursuant to Fed.R.Civ.P.56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.
>
> The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.
>
> Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.
>
> All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

M.D. Pa. Local Rule 56.1.

This Rule "was promulgated to bring greater efficiency to the work of the judges of

the Middle District" and is "essential to the Court's resolution of a summary judgment motion

due to its role in organizing the evidence, identifying undisputed facts, and demonstrating

precisely how each side proposed to prove a disputed fact with admissible evidence."

*Weitzner v. Sanofi Pasteur, Inc.*, 909 F.3d 604, 613 (3d Cir. 2018) (internal quotation marks

omitted). A District Court "is in the best position to determine the extent of a party's

noncompliance with Local Rule 56.1, as well as the appropriate sanction for such

noncompliance", including striking non-responsive statements of material fact by the non-moving party or deeming a moving party's statements of material fact to be admitted where the non-moving party fails to respond. *Id. See also Ryan v. Berwick Industries, Inc.*, 30 F.Supp.2d 834, 837 (M.D.Pa. 1998) (deeming Defendant's statement of material facts to be undisputed where Plaintiff failed to file a statement of material facts responding to that of Defendant). However, even when deeming as undisputed the moving party's statement of material facts, a court is still required to conduct a "full analysis to determine whether granting summary judgment [is] appropriate." *Weitzner*, 909 F.3d at 614 (citing *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990)).

Plaintiff's "Statement of Additional Material Facts Precluding Summary Judgment" (Doc. 22-20) is not recognized by Local Rule 56.1. Therefore, although the Court will consider Plaintiff's Counterstatement of Material Facts (Doc. 22-19) in determining whether there is a genuine dispute of material fact, the Court will decline to consider Plaintiff's Statement of Additional Material Facts (Doc. 22-20.) *See Rau v. Allstate Fire & Cas. Ins. Co.*, 793 F. App'x 84 (3d Cir. 2019) (affirming this Court's decision to decline to consider Rau's Counterstatement of Undisputed Facts). Thus, the Court will admit all of Defendant's statements of facts that are unopposed below.[1]

---

[1] The Court will omit all internal citations to the record. The Court has verified that Defendant's citations are correct and support its factual propositions.

Plaintiff Jacqueline Powell was hired by Defendant Boscov's Department Store, LLC at its Wilkes-Barre, Pennsylvania location on or about March 7, 2010. (SOF ¶ 1; RSOF ¶ 1.) Powell was initially hired as a part-time sales clerk in the Children's, Lingerie, and Women's World Department. (SOF ¶ 2; RSOF ¶ 2.) Powell was promoted to a full-time position in June or July of 2010. (SOF ¶ 3; RSOF ¶ 3.) On or about January 24, 2012, Powell was promoted to a Department Manager of the Gifts and China Department. (SOF ¶ 4; RSOF ¶ 4.)

In the Gifts and China Department, the products sold included china, dishware, serve ware, flatware, glasses, beverageware, home décor, seasonal items, artwork, candles, salt lamps, figurines, Jim Shore products, Oleg Cassini products, pet beds, pet toys, and pet products. (SOF ¶ 5; RSOF ¶ 5.)[2] Powell also oversaw the Bridal Department which involved registering brides for a registry and assisting the brides in adding items to their registry. (SOF ¶ 6; RSOF ¶ 6.)

Powell typically worked eight (8) hours a day and during the holiday season from ten (10) to twelve (12) hours a day. (SOF ¶ 7; RSOF ¶ 7.) As a Department Manager for the Gifts and China Department, Powell was responsible for overseeing the individuals in her department, making schedules, doing markdowns and markups, making floor presentations, receiving stock, putting out stock, putting stock on shelves, keeping the department clean,

---

[2] Plaintiff notes that "other items sold in the Gifts and China Department included, but were not limited to, picture frames, floral arrangements, and knickknacks." (Def. Ex. C, Marko Dep., Doc. 18-3 at 43:20-24; Def. Ex. A, Powell Dep., Doc. 18-1 at 46:6-19.)

working out any issues that occurred including scheduling issues and product issues, setting up planograms, setting up and taking down sales, returning items to vendors, salvaging items, completing credit applications, and communicating with upper management. (SOF ¶ 8; RSOF ¶ 8.) As a Department Manager, Powell spent the majority of her eight (8) hour workday on her feet, only sitting down when making schedules, answering emails, or taking care of a bride. (SOF ¶ 10; RSOF ¶ 10.)

Powell did not weigh the merchandise that she lifted and carried, so she does not know exactly how much the boxes weighed. (SOF ¶ 14; RSOF ¶ 14.) Powell described dish sets that she would lift that may have weighed more than 15 pounds. (SOF ¶ 15; RSOF ¶ 15.) Powell described that dish sets would come in a large cardboard shipping box with two (2) sets of dishes in each box. (*Id*.) Upon receiving the boxed dishes, Powell would lift the set of dishes out of the cardboard box and lift it up to put it in the basket of a shopping cart. (*Id*.) Powell estimated that the dish sets weighed approximately 20 to 25 pounds. (*Id*.) Powell testified that the maximum amount of dish sets that could fit in a shopping cart was three and then would push the shopping cart through the store to the Gifts and China Department. (SOF ¶ 16; RSOF ¶ 16.) Powell or one of the two other employees in her department would then have to lift each dish set box out of the shopping cart onto the shelf which could be either on the bottom, middle, or top shelf. (*Id*.) The top shelf was located above shoulder level, meaning an employee would have to raise their arms and lift the dish set box above their shoulders. (SOF ¶ 17; RSOF ¶ 17.)

Customers purchasing dish sets would frequently take the dish sets off the shelves themselves and bring them to the register, however, if a customer was older or requested assistance lifting the dish set box, Powell stated that she would help the customer lift the dish set box. (SOF ¶ 18; RSOF ¶ 18.) Powell would also help carry or transport the dish sets approximately 15 to 20 feet from the shelf to the register area via cart. (Powell Dep. at 60:12-20; SOF ¶ 19; RSOF ¶ 19.)

As a Department Manager, Powell also had the same responsibilities as a salesperson if a customer needed help. (SOF ¶ 20; RSOF ¶ 20.) The Gifts and China Department did not have a stock person designated for that Department at the time of Powell's injury, which resulted in Powell and the other sales associates in her department performing the stocking duties at the time of Powell's injury. (SOF ¶ 21; RSOF ¶ 21.)

During the last year of Powell's employment with Boscov's, she had two (2) permanent employees in her department and would also receive occasional help from "floaters" or employees who work on the dock. (SOF ¶ 22; RSOF ¶ 22.) Department Managers and salespersons would frequently be required to assist in neighboring departments as well and could be transferred either temporarily or permanently to another department. (SOF ¶ 23; RSOF ¶ 23.)

In the months leading up to Powell's injury, she had requested a stock person for the Gifts and China Department to help with the stockroom, but no person was available and the person who was supposed to be hired as the stock person for the Gifts and China

Department declined the job offer. (SOF ¶ 24; RSOF ¶ 24.) Since no stock person was hired for Powell's department, she was informed that she could get help from the dock. (SOF ¶ 25; RSOF ¶ 25.) The Gifts and China Department nonetheless did not receive help from the dock employees because dock employees were performing their primary job duties and assisting in other departments. (*Id*.)

**Powell's Injury**

On Sunday, December 1, 2019, Powell was injured at work. (SOF ¶ 26; RSOF ¶ 26.) Powell was in the back stock room trying to get stock out onto the floor. (SOF ¶ 27; RSOF ¶ 27.) According to Powell, the stock was "so jumbled up" because they did not have a stock person and the stock was piled everywhere in no particular order. (*Id*.) Powell was taking dish sets in boxes out to the floor when she injured herself. (*Id*.) In the process of lifting a dish set box from the cardboard box that was on the floor to place into the shopping cart, the dish set box became stuck and when it released from the floor Powell fell backwards into the stacks of merchandise and injured herself. (*Id*.) Powell injured her buttocks, back, shoulder, and down her leg when she fell. (SOF ¶ 28; RSOF ¶ 28.)

Powell spoke with John Marko ("Marko"), the store's Human Resources Manager, either the day of the accident or the next morning. (SOF ¶ 29; RSOF ¶ 29.) Powell did not go to the doctor or a hospital the day she was injured, and she continued to work a few days after her injury. (SOF ¶ 30; RSOF ¶ 30.)

Powell was observed by the Loss Prevention Department using a cane in her department. (SOF ¶ 31; RSOF ¶ 31.) Marko went to see Powell and instructed her to report her injury. (*Id.*) On or about December 7, 2019, Powell requested a leave of absence due to her injury which was approved by Boscov's. (SOF ¶ 32; RSOF ¶ 32.) Powell went to Wilkes-Barre General Hospital the Sunday following the day she was injured. (SOF ¶ 33; RSOF ¶ 33.) Powell had x-rays and was advised that her hip was not broken and that her shoulder was not dislocated. (SOF ¶ 34; RSOF ¶ 34.)

Wilkes-Barre General Hospital gave Powell a note that put her out of work from December 8, 2019 – December 10, 2019. (SOF ¶ 35; RSOF ¶ 35.) The next day, Powell went to Concentra in Wilkes-Barre Township. (SOF ¶ 36; RSOF ¶ 36.) The physicians at Concentra initially thought that Powell pulled a muscle and that she had sciatica which resulted in her being unable to walk. (SOF ¶ 37; RSOF ¶ 37.) The physicians initially believed that Powell pulled a muscle in her shoulder, but it was later determined that she tore her rotator cuff. (*Id.*) Powell believes she was advised that she tore her rotator cuff in January of 2020. (SOF ¶ 38; RSOF ¶ 38.)

Powell was paid either through sick leave or workers' compensation from the time of her injury until she was terminated. (SOF ¶ 39; RSOF ¶ 39.) Powell provided doctors' notes in person to either Marko or the Store Manager, Ryan Thomas. (SOF ¶ 40; RSOF ¶ 40.) Concentra provided Powell with a note dated December 10, 2019, permitting her to return to work on December 10, 2019, with the following restrictions: should be sitting 90 percent of

the time; must use assistive device, cane; but allowing Powell to work her entire shift. (SOF ¶ 41; RSOF ¶ 41.)

There was no job at Boscov's that would allow Powell to be seated 90 percent of the time. (SOF ¶ 42; RSOF ¶ 42.) Powell agrees that her job requires her to be on her feet almost the entire day and that she cannot wait on customers and help customers while sitting 90 percent of her workday. (SOF ¶ 43; RSOF ¶ 43.) Powell was provided with a doctor's note dated December 13, 2019, permitting her to return to work on December 13, 2019 with the following restrictions: may lift up to 10 pounds occasionally up to three (3) hours a day; may push/pull up to 10 pounds occasionally up to three (3) hours a day; must use assistive device, cane; able to work entire shift; no reaching above shoulders or head with affective extremity. (SOF ¶ 44; RSOF ¶ 44.) Powell believes she could have returned to work with the restrictions listed in the December 13, 2019, doctor's note and that she could have asked fellow employees to lift an item in the department that she could not lift.[3] (SOF ¶ 45; RSOF ¶ 45.)

Powell agrees that she cannot lift a box of china with just one hand or arm. (SOF ¶ 46; RSOF ¶ 46.) The accommodation Powell wanted Boscov's to offer her was to be excused from lifting items heavier than her restrictions allowed. (SOF ¶ 47; RSOF ¶ 47.) Powell was provided a doctor's note dated December 20, 2019, permitting her to return to

---

[3] Defendant mistakenly refers to a December 17, 2020, doctor's note. (See SOF ¶¶45, 49). The Court finds that there is no such doctor's note in the record. (*See* Plaintiff's Ex. J, Doc. 22-6 at 5.) Therefore, the Court will replace references to a December 17, 2020 doctor's note with the December 13, 2020 doctor's note in the record.

work with the following restrictions: may lift up to 10 pounds occasionally – up to 3 hours per day; may push/pull up to 10 pounds occasionally – up to 3 hours per day; must use assistive device – cane; no reaching above shoulder or head with affected extremity. (SOF ¶ 48; RSOF ¶ 48.)

Boscov's claims that it was unable to accommodate the restrictions in Powell's December 13, 2019 and December 20, 2019 doctor's notes. (SOF ¶ 49; RSOF ¶ 49.) Marko informed Powell she would not be permitted to return to work while using a cane to assist with walking. (SOF ¶ 50; RSOF ¶ 50.) Powell needed a cane for support to assist her walking until sometime in January of 2020, and she understood that Boscov's would not allow her to work with a cane and did not agree with the determination. (SOF ¶ 51; RSOF ¶ 51.)

After Powell no longer required a cane, she went back to Marko to ask if she could return to work. (SOF ¶ 52; RSOF ¶ 52.) Powell still had other work restrictions when seeking to return to work, including lifting and reaching restrictions. (SOF ¶ 53; RSOF ¶ 53.) Powell could extend her left arm and reach up to shoulder level, but she could not lift over her head with her left arm. (*Id.*) Powell agrees that she would lift over her head to put dishes back onto display shelves. (SOF ¶ 54; RSOF ¶ 54.) Powell believes she should have been able to return to work even without being able to lift over her head because other people in her department could have performed that job function for her. (SOF ¶ 55; RSOF ¶ 55.)

Powell was provided with a doctor's note dated on January 3, 2020 that permitted her to return to work with the following restrictions: may lift up to 10 pounds occasionally – up to 3 hours per day; may push/pull up to 10 pounds occasionally – up to 3 hours per day; able to work entire shift; no reaching above shoulder or head with affected extremity. (SOF ¶ 56; RSOF ¶ 56.) Powell was provided a doctor's note dated January 21, 2020, and January 22, 2020, which included the same restrictions in her January 3, 2020 note. (SOF ¶ 57; RSOF ¶ 57.) Powell was provided with doctor's notes dated February 12, 2020, February 26, 2020, and March 18, 2020, with the following restrictions: may lift up to 15 pounds occasionally – up to 3 hours per day; may push/pull up to 15 pounds occasionally – up to 3 hours per day; able to work entire shift; no reaching above shoulders with affected extremity. (SOF ¶ 58; RSOF ¶ 58.) Boscov's did not accommodate Powell's restrictions contained in the January 3, 2020, January 21, 2020, January 22, 2020, February 12, 2020, February 26, 2020, and March 18, 2020. (SOF ¶ 59; RSOF ¶ 59.) Powell's restrictions had lifting, pushing, and pulling weight restrictions as well as time limits on these activities of up to three (3) hours a day. (*Id*.)

At no point prior to Powell's termination did a doctor provide her with a return-to-work letter with no restrictions. (SOF ¶ 60; RSOF ¶ 60.) Instead, Powell was under lifting restrictions and was unable to lift up to 50 pounds in each of her return-to-work letters. (*Id*.) Powell was provided with a doctor's note dated May 1, 2020, which permitted her to return to work on light duty with no lifting over 25 pounds. (SOF ¶ 61; RSOF ¶ 61.) Powell was

provided with a doctor's note dated May 29, 2020, which reduced her lifting restrictions to no lifting over 15 to 20 pounds. (SOF ¶ 62; RSOF ¶ 62.) Boscov's Wilkes-Barre store was closed due to the COVID-19 pandemic at the time of the May 1, 2020, and May 29, 2020 notes. (SOF ¶ 63; RSOF ¶ 63.) Powell stated that she would not be aware of other department managers at Boscov's with a lifting restriction of less than 50 pounds who were permitted to work. (SOF ¶ 64; RSOF ¶ 64.) Powell had difficulty holding her left arm above her head until after April of 2021. (SOF ¶ 65; RSOF ¶ 65.)

When Marko would receive a doctor's note from Powell or through the workers compensation insurance carrier advising of Powell's work restrictions, he would contact Georgine Martinez ("Martinez"), claims administrator of Boscov's Risk Management Department, to discuss Powell's restrictions in order to determine whether or not Boscov's would be able to accommodate them. (SOF ¶ 66; RSOF ¶ 66.) Risk management would make the determination if Boscov's could accommodate Powell's work restrictions. (SOF ¶ 67; RSOF ¶ 67.)

When evaluating whether Boscov's can accommodate an employee's work restrictions, including Powell's work restrictions, it considers the employee's job description, staffing issues, and position availability. (SOF ¶ 68; RSOF ¶ 68.) Risk management will contact the store's human resources manager to have a discussion on whether or not Boscov's could accommodate a specific work restriction. (*Id.*)

Powell was provided with a doctor's note dated July 2, 2020 permitting her to return to work with restrictions of light duty and no lifting over 15-20 pounds. (SOF ¶ 69; RSOF ¶ 69.) Following the Wilkes-Barre store reopening, Boscov's did not offer Powell the option of having another coworker help out in the department because of the reduction in force resulting in less employees at the store. (SOF ¶ 70; RSOF ¶ 70.) Carol Sheetz ("Sheetz"), Vice President of Human Resources at Boscov's, stated that there was not a lot of flexibility to reassign people and adding extra hands into a specific area. (*Id*.) Sheetz also stated that the workers who did return post-COVID took on more because they were required to in order to get the building open. (*Id*.) At the time of the July 2, 2020 doctor's note, Boscov's had already undergone a reduction in force where Powell's Department Manager position was eliminated and there was less staff working at the Wilkes-Barre location. (SOF ¶ 71; RSOF ¶ 71.)

On July 2, 2020, Martinez emailed Sheetz and Ken Chabin ("Chabin") advising that Powell had been out of work since December 1, 2019, with a shoulder injury and remained out of work with a frozen shoulder. (SOF ¶ 72; RSOF ¶ 72.) Martinez advised that Powell's six (6) months of leave expired on June 2, 2020. (*Id*.)

On July 6, 2020, Marko sent an email to Sheetz stating that he spoke with Martinez about Powell's medical update indicating that nothing had changed with her condition and that Boscov's would be unable to accommodate her restrictions. (SOF ¶ 73; RSOF ¶ 73.)

13

Marko advised that Powell's position was eliminated in the restructured opening following COVID and inquired about terminating Powell. (*Id.*)

**COVID-19 Pandemic Shutdown and After Effects**

Boscov's Wilkes-Barre location was shut down due to the COVID-19 pandemic from March 17, 2020 through May 30, 2020. (SOF ¶ 74; RSOF ¶ 74.) As a result of the significant, negative financial impact of the pandemic on Boscov's operations, Boscov's was forced to implement a major reduction in force, impacting over 2,300 employees. (SOF ¶ 75; RSOF ¶ 75.) When Boscov's reopened its Wilkes-Barre store, not all employees were brought back, and several departments were consolidated. (SOF ¶ 76; RSOF ¶ 76.)

Prior to the pandemic, Boscov's employed twenty-three (23) Department Managers at its Wilkes-Barre location. (SOF ¶ 77; RSOF ¶ 77.) Due to the pandemic, Boscov's was forced to eliminate various Department Manager positions at the Wilkes-Barre location, including the Gifts and China Department Manager position. (SOF ¶ 78; RSOF ¶ 78.) The Gifts and China Department was consolidated with the Housewares, Candy, as Seen on Television Department in addition to the Small Appliances Department following the COVID shutdown. (SOF ¶ 79; RSOF ¶ 79.)

Powell was not terminated when her position was eliminated. (SOF ¶ 80; RSOF ¶ 80.)[4] Rather, she remained on a medical leave of absence. (*Id.*) Powell does not believe

---

[4] The Court notes that, although Powell was not terminated immediately following the elimination of her position, Defendant states earlier in its Statement of Facts that "Mr. Marko advised that Ms. Powell's position was eliminated in the restructured opening following COVID and inquired about terminating Ms. Powell." (SOF ¶ 73.)

she could have lifted a microwave with one hand or arm following the consolidation of her department and the Small Appliances Department. (SOF ¶ 81; RSOF ¶ 81.)

**Powell's Termination**

Powell was on a medical leave of absence from December 12, 2019 until her termination on or about July 22, 2020, a period in excess of six (6) months. (SOF ¶ 82; RSOF ¶ 82.) Powell was terminated from Boscov's on or about July 22, 2020 after she was out on medical leave for over six (6) months. (SOF ¶ 83; RSOF ¶ 83.)

Any Boscov's employee who is unable to return to work after six (6) months of medical leave and who does not have a reasonable return to work date is typically terminated. (SOF ¶ 84; RSOF ¶ 84.) Marko received a call from Boscov's Corporate Human Resources office confirming that Powell's employment was terminated. (SOF ¶ 85; RSOF ¶ 85.) Powell did not find out about her termination until September of 2020 when Marko informed her that she was terminated because she was out on medical leave for too long. (SOF ¶ 86; RSOF ¶ 86.)

**Powell's Workers Compensation**

Powell went out of work on workers' compensation in December of 2019 and she began to receive payments during the same time period. (SOF ¶ 87; RSOF ¶ 87.) Powell knew less than a handful of Boscov's employees who had been on workers' compensation, and she never had discussions with those individuals as to whether they were unhappy about the way Boscov's treated them while they were on workers' compensation. (SOF ¶

88; RSOF ¶ 88.) No one at Boscov's ever said anything to Powell to express unhappiness that she applied for or received workers' compensation benefits. (SOF ¶ 89; RSOF ¶ 89.)

Powell believes that applying for or receiving workers' compensation benefits was "frowned upon" because they were looked at as a liability. (SOF ¶ 90; RSOF ¶ 90.) Powell believes individuals who applied for or received workers' compensation benefits were frowned upon because she was on the safety committee which held monthly meetings to discuss and review items to make the store safer. (SOF ¶ 91; RSOF ¶ 91.) Powell is unaware of Boscov's terminating another employee's employment because they applied for workers' compensation benefits. (SOF ¶ 92; RSOF ¶ 92.) Powell settled her workers' compensation claim on or about July 16, 2021. (SOF ¶ 94; RSOF ¶ 94.)

**Boscov's Storage of Employee Medical Information**

Boscov's keeps a physical medical file on every employee that is kept separate from the employee's personnel file. (SOF ¶ 95; RSOF ¶ 95.) The medical files are kept in the store's Human Resources office in a separate filing cabinet apart from employee personnel files. (SOF ¶ 96; RSOF ¶ 96.)

### III. STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute

is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan,* 497 U.S. at 888. Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be

taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.

1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary

judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts.  Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial.  The mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no *genuine* issue of *material* fact.
> When opposing parties tell two different stories, one of which is blatantly
> contradicted by the record, so that no reasonable jury could believe it, a court
> should not adopt that version of the facts for purposes of ruling on a motion for
> summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make

credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at

255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may

be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

## IV. ANALYSIS

In its Motion for Summary Judgment (Doc. 18), Defendant seeks summary

judgement on all of Plaintiff's claims found in her Complaint (Compl., Doc. 1). First,

Defendant seeks summary judgment on Counts I and II of Plaintiff's Complaint that allege

Americans with Disabilities Act of 1990 ("ADA") § 102(a), 42 U.S.C.A. § 12112(a), *et seq*.,

and Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq*., disability

discrimination claims. (*See* Doc. 19 at 2.) Second, Defendant seeks summary judgment on

Plaintiff's Failure to Maintain Confidential Medical Records Claim (Compl., Doc. 1 ¶ 62). (*Id.*

at 27.) Third, Defendant seeks summary judgment on Counts I and II of Plaintiff's Complaint

that allege ADA and PHRA retaliation claims. Fourth, Defendant seeks summary judgment

on Count III of Plaintiff's Complaint that presents a state law wrongful discharge claim. The

Court will address each of these alleged bases for summary judgment in turn.

### A.   COUNT I AND II: PLAINTIFF'S ADA AND PHRA DISABILITY DISCRIMINATION CLAIMS[5]

Defendant contends that it is entitled to summary judgment on Plaintiff's Claims

contained within Count I and II of her Complaint that allege discrimination on the basis of

her disability. (Doc. 19 at 8.) Defendant argues that Plaintiff "cannot sustain her evidentiary

burden of establishing disability discrimination under the *McDonnell Douglas* analytical

framework, and, therefore, this Honorable Court must enter judgment against Ms. Powell as

to Counts I and II." (*Id.*)

> Because the ADA, ADEA and Title VII all serve the same purpose, to prohibit
> discrimination in employment against members of certain classes, the methods
> and manner of proof under one statute should inform the standards under the

---

[5] Because liability under the ADA and PHRA is subject to the same analysis, the parties' arguments concerning Defendant's alleged violations of these two statutes are consolidated simultaneously herein. *See Colwell v. Rite Aid Corp.,* 602 F.3d 495, 500 n.3 (3d Cir. 2010) ("the same legal standard that applies to the ADA applies equally to disability discrimination claims under the PHRA. [...] It is similarly proper to address ADEA and PHRA age discrimination claims collectively") (Internal brackets and citations omitted).

others as well; accordingly, the *McDonnell Douglas* burden-shifting framework
for Title VII cases is applicable to discrimination claims under the Rehabilitation
Act, Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. §
621 et seq.; Rehabilitation Act of 1973, § 501 et seq., 29 U.S.C.A. § 791 et
seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.;
Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et
seq.

*Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007).

Therefore, the *McDonnell Douglas* burden-shifting framework set out above applies

to Plaintiff's disability discrimination claims. *Id.*; *see also McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973). To make out a prima facie case of disability discrimination, a plaintiff

must establish that  "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he

is otherwise qualified to perform the essential functions of the job with or without reasonable

accommodations by the employer; and (3) [s]he has suffered an otherwise adverse

employment decision as a result of discrimination." *Thimons v. PNC Bank, N.A.*, 254 F.

App'x 896, 897 (3d Cir. 2007).

Defendant does not contest that Plaintiff is a disabled person within the meaning of

the ADA and PHRA, but argues only that "Ms. Powell cannot satisfy her burden of

establishing a prima facie case of disability discrimination because she is unable to show

that she was qualified to perform the essential functions of her job, with or without a

reasonable accommodation and she is unable to show that her termination was a result of

discrimination." (Doc. 19 at 9-10.) The Court will address each of Defendant's arguments in

turn.

20

**1. Disparate Treatment: Prima Facie Case**

**a. Qualified to Perform Essential Functions of Job**

Defendant first contends that "Ms. Powell cannot satisfy her burden of establishing a prima facie case of disability discrimination because she is unable to show that she was qualified to perform the essential functions of her job, with or without a reasonable accommodation." (Doc. 19 at 9.) As the Third Circuit explained in *Turner*,

> [a] "qualified individual" is defined as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Buskirk*, 307 F.3d at 168. The EEOC regulations divide this inquiry into two parts: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position. 29 C.F.R. § 1630.2(n); *Buskirk*, 307 F.3d at 168. The determination of whether an individual with a disability is qualified is made at the time of the employment decision, and not at the time of the lawsuit. *Gaul*, 134 F.3d at 580.

*Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006).

Defendant does not contest that Plaintiff "has the requisite skill, experience, education and other job-related requirements of the position sought," *Turner*, 440 F.3d at 611, but only argues that "Ms. Powell is unable to establish that she can perform the essential functions of lifting, pushing, and pulling, with or without a reasonable accommodation." (Doc. 19 at 10.)

"[W]hether a particular function is essential 'is a factual determination that must be made on a case by case basis based upon *all* relevant evidence.'" *Turner*, 440 F.3d at 612

(quoting 29 C.F.R. § 1630.2(n)); *Deane v. Pocono Medical Ctr.,* 142 F.3d 138, 148 (3d Cir.

1998). Whether a job duty is an "essential function" turns on whether it is "fundamental" to

the employment position. 29 C.F.R. § 1630.2(n)(1). The term "essential function" does not

include the "marginal" functions of the position. *Id.* A job function may be considered

essential for any of several reasons, including, but not limited to, the following:

> (i) The function may be essential because the reason the position exists is to perform that function;
>
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

*Id.* at § 1630.2(n)(2).

Evidence of whether a particular function is essential might include, but is not limited

to, the following factors:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;
>
> (vi) The work experience of past incumbents in the job; and/or
>
> (vii) The current work experience of incumbents in similar jobs.

*Id.* at § 1630.2(n)(3).

"While the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, the employer will have to show that it actually imposes such requirements on its employees in fact, and not simply on paper." *Supinski v. United Parcel Serv., Inc.,* 413 F. App'x 536, 540 (3d Cir. 2011) (internal quotations omitted).

Here, there is sufficient evidence to create a genuine and material dispute of fact as to whether "lifting up to fifty (50) pounds, pushing, and pulling are essential functions of the Department Manager position." (Doc. 19 at 10.) Defendant points to its Department Manager job description (Doc. 22-3) provided to Plaintiff to argue that "essential physical functions of Ms. Powell's position include being on her feet, bending, lifting/carrying up to 50 pounds, reaching, walking, climbing, stooping, pushing/pulling, twisting/turning, and manual dexterity." (Doc. 19 at 11.) The referenced form reveals that lifting, reaching, and pushing/pulling are not expressly identified as "essential functions" in the written job description for Plaintiff's position. (*See* Doc. 22-3) These physical activities are not listed under the "Essential Job Functions/Major Tasks" heading of Defendant's job description and are instead listed under the "Physical Demands/Working Conditions" heading. (*Id.*) This gives the Court pause at concluding that there is no genuine dispute of fact as to whether lifting, pushing, and pulling up to fifty (50) pounds were essential job functions. Indeed, in the "Essential Job Functions/Major Tasks" section of the job description form, the essential

responsibilities center on assisting customers with questions and complaints, selling

products, managing a staff of employees, maintaining the conditions of her department, and

filling out paperwork. (*Id*.) Based on the job description form (Doc. 22-3), a reasonable jury

could conclude that lifting, pushing, and pulling up to 50 pounds were merely "marginal" job

functions. *See* 24 C.F.R. § 1630.2(n)(1).

Upon examining "the amount of time spent on the job performing the function," §

1630.2(n)(3), the Court finds that this consideration also reveals a genuine dispute of

material fact as to whether lifting up to 50 pounds was an essential job function. Plaintiff

points to portions of her deposition testimony indicating that it was a rarity to lift heavy

objects by herself during work:

> Q. Fair enough. And then it says in bold, black belts are provided. Did you ever ask or utilize a black belt?
>
> A. No, I never had any need to because the big sets of dishes I did not move. We would have the guys from the dock do that.
>
> . . . .
>
> Q. Did you ever have a conversation or conversations with John Marko about how he could accommodate your restrictions to enable you to come back?
>
> A. Yes. I had that way in the beginning, way in the beginning I said, John, my only issue, my only issue is putting the set of dishes up on the top shelf. All the other shelves I can put the dishes on. It was just the top shelf. I said, I can go and have one of the other girls do it. Because remember, I assign their workload for the day. I can go and ask the guys from the dock to do it. I can ask the neighboring department. You have to realize, on that top shelf there's only like 12 sets of dishes.
>
> . . . .

Q. Now, you worked for Boscov's for approximately ten years, correct?

A. Yes.

Q. And could you estimate how many times throughout that ten year of employment you had to buy yourself lift something close to 50 pounds?

A. By myself? No, no. Like I said, if it was heavy -- and I don't know if it was 50 pounds or not. If I go to try and lift and it was heavy, I would just get somebody to help me.

Q. Okay.

A. There was really hardly anything in my department that was that heavy. And, again, when I help out in Small Appliances, we would have customer pickup do it or we would have the stock girl do it. So it couldn't have been heavy if she could lift it too.

(Def. Ex. A, Powell Dep., Doc. 18-1 at 81:20-25; 150:20-151:9; 152:14-153:5.)

Plaintiff's deposition testimony provides evidence that lifting products in excess of

twenty (20) to twenty-five (25) pounds was an uncommon occurrence, and that Plaintiff

likely spent only a portion of her time moving items of any significant weight. (*See also* Doc.

22-3.) Defendant's own job description form reveals that only fifteen percent (15%) of

Plaintiff's time was dedicated to "receive stock, transfer merchandise, process

damages/savings; complete floor moves; develop merchandising techniques; maintain

clean and dust free department & wrap stands," (*id*.), of which only a portion of those tasks

likely involved lifting anything of significant weight. (*See* Powell Dep. at 81:10-25; 150:20-

151:9; 152:14-153:5.) Plaintiff also testified that she could lift almost anything that was in

her department with her uninjured arm alone:[6]

> Q. But once it happened, you would acknowledge that Boscov's has a
> responsibility to follow what your doctor is saying for your safety, right?
>
> A. I understand what you're saying but you're only taking into consideration
> what was damaged was my left arm and not my right arm. And the merchandise
> that would require two arms would be a set of dishes that would require two
> arms. Pretty much anything that I can think of off the top of my head you could
> do with one arm. So if I didn't have a left arm at all, at all, I could lift probably
> 99 percent of the merchandise that was in my department.

(Powell Dep. at 114:25-115:13.)

This testimonial evidence, paired with the employment description form (Doc. 22-3),

offers sufficient evidence for a reasonable jury to question whether lifting, pushing, and

pulling objects of any significant weight by herself was a common occurrence or

requirement throughout her employment. This evidence creates a genuine dispute of fact as

to whether lifting, pushing, and pulling up to 50 pounds were essential job functions. *See,*

*e.g., DePace v. Norfolk S. Ry. Co.,* No. 2:19-CV-00061-CRE, 2021 WL 1375504, at *6

(W.D. Pa. Apr. 12, 2021) (finding that testimony of machinist-plaintiff, who suffered rotator

cuff injury, about his actual day-to-day work showed genuine dispute of material fact as to

"whether lifting up to 50 pounds and repetitively reaching above the shoulder" were

essential functions of the job). The Third Circuit has repeatedly held that the question of

---

[6] Plaintiff acknowledges that she could not lift certain boxes of china and microwaves with only one
hand. (Powell Dep. at 108:4-109:12; 118:16-119:5.) This does not change the Court's analysis as to
whether there is a genuine dispute of material fact with respect to whether lifting, pushing, and pulling up to
50 pounds were essential functions of Plaintiff's job.

whether a certain policy or practice was an essential function of an employee's job is

typically a question for the jury:

> While our analysis points in the direction of finding that the rotation policy was not an essential function of Turner's job, we have historically refused to make such a factual finding on our own, lest we run afoul of our own directive to the district courts that these issues are for the jury to decide. In *Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 148 (3d Cir.1998) (en banc), the employer/hospital claimed that lifting heavy objects was an essential function of Deane's job as evidenced by the job description of her nursing position. That job description included "frequent lifting of patients" as one of the "major tasks, duties and responsibilities" of a nurse in Deane's position. 142 F.3d at 148. Deane admitted that lifting heavy objects, including patients, was a "critical job demand[ ]," and the hospital insisted that a "nurse's inability to lift patients" could create a dangerous situation for Deane's patients. *Id.* Nevertheless, despite the intuitive appeal of the hospital's argument, we refused to grant summary judgment, concluding that whether lifting heavy objects was an essential function of being a nurse was a factual question for the jury. *Id.*

> Similarly, in *Skerski v. Time Warner Cable Co.,* 257 F.3d 273 (3d Cir.2001), the plaintiff was employed by Time Warner to service cables, wires, and aerial cable plants, and upon being diagnosed with panic and anxiety disorder, he became unable to climb and work at heights. 257 F.3d at 276. The District Court reasoned that "climbing was an essential function of the installer technician's job that Skerski could not perform" and granted judgment as a matter of law to Time Warner because Skerski was not a qualified individual under the ADA and therefore could not establish his *prima facie* case. *Id.* We reversed, concluding that the definition of "essential function" set forth in 29 C.F.R. § 1630.2(n)(1), as well as the non-exhaustive list of probative evidence set forth in 29 C.F.R. § 1630.2(n)(3), cautioned against any premature determination of what is an essential function. *Id.* at 280.

> So, too, here, the issue should be decided by a jury. Turner has presented evidence to support a reasonable jury in finding that rotating is not an essential function of the shaker table inspector position and, therefore, that she is a qualified individual within the meaning of the ADA. Accordingly, we hold the District Court erred in granting summary judgment and determining that Turner was not a "qualified individual" under the ADA because she could not perform

an essential job function. Rather, the fact issue as to "essential function" must be decided by a jury. *See Deane,* 142 F.3d at 148.

*Turner,* 440 F.3d at 613.

As the Court has explained, *supra*, Plaintiff offers sufficient evidence to challenge Defendant's contention that any of the tasks that Plaintiff was unable to perform were essential. (*See* Doc. 22-3; Powell Dep. at 81:10-25, 114:25-115:13, 150:20-151:9, 152:14-153:5.) Additionally, Plaintiff has pointed to evidence that it was a common occurrence for employees to assist one another with heavy lifts. (*See* Powell Dep. at 152:6-23, 67:11-25, 115:23-117:1, 147:22-148:19, 80:20-23, 81:23-25, 152:11-153:5; Def. Ex. D, Martinez Dep. at 25:22-26:14; Def. Ex. B., Sheetz Dep. at 63:5-21); *see also Davis v. Lowe's Home Centers, Inc.*, No. 13-345, 2014 WL 7269638, at *8-10 (D.N.J. Dec. 17, 2014) (finding sufficient evidence of a genuine dispute as to what weight an employee was required to lift in light of evidence showing employees sought assistance when lifting items); *Supinski,* 413 F. App'x at 540. Plaintiff offers sufficient evidence to find that there is a genuine dispute of material fact as to whether she, with or without reasonable accommodation, can perform the essential functions of her position. 29 C.F.R. § 1630.2(n). Therefore, the Court now addresses whether Plaintiff has provided evidence that she has suffered an adverse employment action because of that disability.

### b. Discriminatory Adverse Employment Action

Defendant argues that Plaintiff fails to establish that she "suffered an adverse employment decision as a result of discrimination." *Thimons v. PNC Bank, N.A.,* 254 F.

App'x 896, 897 (3d Cir. 2007); (Doc. 19 at 17). To make out the third element of a prima facie case of disability discrimination, Plaintiff must point to evidence sufficient to create an inference that a causative link exists between her disability and Defendant's adverse action. *See Hollingsworth v. R. Home Prop. Mgmt., LLC*, 498 F. Supp. 3d 590, 603 (E.D. Pa. 2020). "[T]he Third Circuit has warned against taking 'too restrictive a view of the type of evidence that can be considered probative of the causal link.'" *Kairys v. S. Pines Trucking, Inc.*, No. 2:19-CV-1031-NR, 2021 WL 2073797, at *6 (W.D. Pa. May 24, 2021) (quoting *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir. 2000)). Thus, "[a] plaintiff may rely on 'a broad array of evidence'" to establish causation, including pointing to "evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity 'unusually suggestive of retaliatory motive,'" *Carvalho-Grevious v. Del. State Univ*., 851 F.3d 249, 260 (3d Cir. 2017). "These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Id*.

Termination of employment constitutes an adverse employment action. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998). Defendant does not dispute that Plaintiff suffered an "adverse employment action" in its briefing, and instead only disputes that

Plaintiff suffered an adverse employment action *as a result of* discrimination. (*See* Doc. 19 at 17.)[7]

Plaintiff has offered sufficient evidence to create a genuine dispute of material fact as to whether Plaintiff was required to remain on medical leave and terminated as a result of discrimination. Plaintiff first argues that causation is apparent because "Defendant retained non-disabled employees while discharging disabled employees (including Plaintiff) as part of its COVID-19 reduction in force." (Doc. 22 at 28.) Plaintiff references the deposition testimony of Sheetz to contend that all of the former employees who required medical leave were not offered positions when Boscov's reopened following the temporary COVID-19 closure:[8]

---

[7] Defendant correctly notes that Plaintiff's reliance on *Fowler v. AT&T, Inc.,* 19 F.4th 292 (3d Cir. 2021) for her contention that a medical leave is necessarily an adverse employment action is misplaced, as *Fowler* is distinguishable from the facts here. Nonetheless, because the Court finds that there is a genuine question of fact as to whether Defendant's lifting, pushing, and pulling requirements were essential job functions, there is also a question of fact as to whether Defendant's alleged refusal to allow Plaintiff to return to work—due to its alleged failure to accommodate Plaintiff—was an adverse employment action. *See Williams,* 380 F.3d at 761 ("Adverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities."); *Colwell v. Rite Aid Corp.,* 602 F.3d 495, 504 (3d Cir. 2010); *see also Dahlia v. Rodriguez,* 735 F.3d 1060, 1078 (9th Cir. 2013) ("The Ninth Circuit has held that 'under some circumstances, placement on administrative leave can constitute an adverse employment action.'"); *Ford v. Cnty. of Hudson,* No. 07-5002 SDW, 2012 WL 2522954, at *12 (D.N.J. June 28, 2012) ("an 'adverse employment action' is defined as an action that 'alters [an] employee's compensation, terms, conditions, or privileges of employment.'") As the Court discusses, *infra,* if Plaintiff was able to return to work with reasonable accommodations or no accommodations at all, it may have been an "unreasonable accommodation" on the part of Defendant to continue to require Plaintiff to go out on medical leave despite her continued wishes to return to work.

[8] Defendant disputes Plaintiff's reliance on *Fowler,* 19 F.4th 292, for her contention that she may show an inference of causation between her disability and termination by showing that Defendant retained non-disabled similarly situated employees. (Doc. 25 at 4.) The Court notes that although the legal and factual circumstances of *Fowler* are distinct from those here, the Third Circuit has consistently held that district courts may rely "a broad array of evidence" when considering whether there is causation for

Q. Okay. And I'm just going to scroll down to the split page. So the two other individuals besides Ms. Powell, where it's listed as their position of being out on medical who received no management offer, Colleen Garvey and Ann Kivler, do you know if they ever returned to work at Boscov's?

A. No. The one person, she passed from her illness.

Q. Okay.

A. And the other one, I don't know without looking at it. I don't believe so.

(Def. Ex. B, Sheetz Dep. at 97:11-17.)

Plaintiff also references the deposition testimony of Marko to support her contention

that all of the employees who required medical leave were not offered positions when

Boscov's reopened:

Q. Okay. All right. I'll scroll down -- I'll scroll down here to the -- it's kind of split between two pages, the no management offer section. And we -- you can see on the very bottom line is Jackie Powell, and then the next -- the next -- there's three individuals listed on the next page. So I see that -- and correct me if I'm reading this wrong, that three of the people not receiving a management offer were out on medical. That would be Jackie Powell, Colleen Garvey, and Ann Kivler. Did I read that correctly?

A. That is correct.

Q. Okay. And so, you know, obviously, we've been talking a lot about Jackie. Colleen Garvey, do you know how long she had been out at this point?

A. To the best of my recollection, she may have been out a couple of months. I'm not sure. She was injured outside of work.

Q. Okay. Do you know what her injury was?

discrimination claims. *See Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017); *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir. 2000). The Court finds that Defendant's treatment of other disabled employees is probative of Plaintiff's contention that Defendant had a practice of discriminating against disabled employees.

A. Being realistic, I do not.

Q. Okay. Did she ever return to work at Boscov's?

A. No, she did not.

Q. Was she terminated?

A. To the best of my knowledge, yes, she was.

(Marko Dep. at 116:22-118:6.)

Additionally, Plaintiff points to Defendant's explanations for Plaintiff's termination as evidence of causation. First, Plaintiff points to email communications by Marko indicating that Plaintiff "had an attendance issue before she went out on Comp. that we were addressing and she would not have been brought back after COVID reopening" (Doc. 22-12 at 2) as evidence of an inconsistent explanation for Plaintiff's termination. (Doc. 22 at 30.) Such an explanation for Defendant's decision to not bring back Plaintiff based on performance issues could be viewed as being inconsistent with portions of Marko's later deposition testimony indicating that he had no opinion on Plaintiff's performance.[9] (Def. Ex. C, Marko Dep. at 42:22-43:14.) Additionally, Plaintiff stated in her deposition testimony that the only attendance warning she received was in 2017, three years prior to her termination:

Q. One of the documents more recently shown to you today was the verbal warning for attendance issues in 2017. Do you recall that document?

_____

[9] Although Defendant's explanation has to do with specifically deciding not to bring back Plaintiff following the COVID shutdown rather than her termination, a reasonable jury could nonetheless interpret this explanation as also being used as a reason for her termination. (*See* Doc. 22-12 at 2) ("[...] she would not have been brought back after COVID reopening.)

A. Yes, I do.

Q. Did you get any similar warnings or write-ups in 2018 or 2019 or, you know, similar to that?

A. No, no. And even like I said before, I had to write up people. You always would do a follow-up if the problem continued. And the problem did not continue. I didn't get a 30 day, a 60 day, or a 90 day.

(Powell Dep. at 153:10-22.)

Marko's testimony indicating that Defendant's decision not to allow Plaintiff to return to work due to previous attendance concerns is also inconsistent with Marko's explanation relating to Plaintiff's medical leave-of-absence and inability to accommodate her restrictions:

Q. Okay. And you said, we may be terminating her in the near future. Why did you say that?

A. That was a conversation that I actually had with -- if I remember correctly, with Georgine [Martinez].

Q. Uh-huh.

A. That she was coming up on her – actually, seven months being out on -- on workman's compensation.

Q. Okay. Understood. And who instigated that call? Did Georgine call you or did you call her?

A. No, I probably, at that point, called Georgine to, again, look at the restrictions with her to see if we could accommodate.

Q. Right. And evidently, based on this e-mail, I'm assuming the answer was you could not accommodate her?

A. That is correct, again, with the instructions I would have gotten.

(Marko Dep. at 106:21-107:19.)

A reasonable jury could find that at least four possible stated reasons for Plaintiff's termination: (1) Attendance issues during Plaintiff's active employment; (2) Plaintiff being out on medical leave for too long; (3) Defendant's alleged inability to accommodate Plaintiff's restrictions; and (4) Cuts in staff following the reopening of the store after the COVID-19 closure.[10] The Court finds that a reasonable jury could conclude that these varying explanations, paired with evidence of a pattern of terminating those who were out

---

[10] Defendant disputes Plaintiff's contention that one of Defendant's explanations for discharging her was due to its COVID-19 reduction in force. (*See* Doc. 25 at 5.) The Court notes that Defendant's own Statement of Facts reveals that a possible reason for Plaintiff's termination was due to COVID:

> On July 6, 2020, Mr. Marko sent an email to Ms. Sheetz stating that he spoke with Ms. Martinez about Ms. Powell's medical update indicating that nothing had changed with her condition and that Boscov's would be unable to accommodate her restrictions. Mr. Marko advised that Ms. Powell's position was eliminated in the restructured opening following COVID and inquired about terminating Ms. Powell. Ex. C, N.T. Marko 110:15 – 24; Ex. 8 to N.T. Marko.

(SOF ¶ 73.)

A reasonable jury could also infer through contextual evidence of Defendant's explanations that Plaintiff was terminated because of the impending consolidation of positions. Specifically, email communications by Marko reveal that, at a minimum, the consolidations were a factor in not re-hiring Plaintiff:

> Good afternoon Ken,
> I was doing paperwork/interviewing new coworkers until now so I could not reply. Jackie would be eligible for re-hire if her restrictions were now acceptable. I have not heard on her status since we term[inated] her for No Return from LOA. However, due to the COVID-19 shutdown, her position as the DM of China & Gifts was consolidated and no longer available We had no plans at this time to rehire her. Please advise – thank you and have a nice day.

(Doc. 22-12 at 2.)

Based on this evidence, a reasonable jury could infer that the COVID-19 consolidations were being offered as an additional explanation for Plaintiff's inability to be rehired by Defendant as well as her termination.

on medical leave, are probative of a causal link between Plaintiff's termination and her disability.

Assuming, *arguendo*, that the Court found that Defendant was consistent with respect to its explanation that it terminated Plaintiff due to her being out on medical leave for six months because Defendant could not accommodate her restrictions, there are sufficient inconsistencies with this explanation to also create a dispute of fact. The Court has concluded, *supra*, that there is a dispute of material fact as to whether Defendant's lifting requirements were essential job functions. This finding leads to a possible inconsistency in Defendant's explanation that it terminated Plaintiff due to her being out on leave for six months because Defendant could not accommodate her restrictions. If a jury were to find that Defendant's lifting requirements were not an essential job function, then Defendant would have been responsible for requiring Plaintiff to remain on leave for six months, thereby reaching Defendant's "typical" limit for leave before termination. (*See* SOF 84.)

Plaintiff also points to her own deposition testimony indicating that she was told she could not work with a cane, *regardless* of her physical ability:

> Q. Hold on. What do you understand about the cane? You would agree that you could not work as a department manager with a cane?
>
> A. Right. I was told you can't work with a cane.
>
> Q. Right. And do you agree with that?
>
> A. I still think I could have. I worked with the cane after I got hurt. And then when they saw that I had a cane, John Marko told me you can't work with a cane.

> Q. And did he indicate why you can't work with a cane? A. No, he did not. He just told me I couldn't work with a cane.

(Powell Dep. at 97:18-98:6.)

In addition to Plaintiff's testimony regarding Defendant's alleged no-cane policy, the deposition of Martinez could also be interpreted by a jury as being antagonistic to anyone with an assistive device, such as Plaintiff, regardless of their actual physical capabilities:

> Q. You see this restriction, would you ask the employee or their medical provider whether, you know, what they can do with a cane or you're assuming they can't do those physical activities?
>
> A. Well, if you're looking at the restriction itself, it says must use assistive device.
>
> Q. Right.
>
> A. So based on that, that would be enough for us to say we can't accommodate.

(Martinez Dep. at 52:2-10.)

Viewing the record as a whole, there is sufficient evidence to allow a reasonable jury to conclude that Defendant's communicated policies and practices amounted to a pattern of antagonism toward Plaintiff, and thus could permit a reasonable jury to infer causation between Plaintiff's protected activity and her termination. Therefore, the Court finds that Plaintiff has raised sufficient evidence to make out a prima facie case of disability discrimination through disparate treatment.

### 3. Legitimate, Non-Discriminatory Reason

If a plaintiff establishes a prima facie case of discrimination, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action." *Krouse*, 126 F.3d at 500. The defendant's burden of producing a legitimate, nondiscriminatory reason is "relatively light" and the proffered reasons do not have to be the actual cause of the negative employment action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Here, Defendant first contends that "the record is clear that the only reason Boscov's terminated Mr. Powell's employment was because she was unable to return to work to perform her essential job functions after she was out on medical leave for over sex (6) months." (Doc. 19 at 30); *see also Griesbaum v. Aventis Pharmaceuticals*, 259 Fed. App'x 459, 468 (3d Cir. 2007); *Shaner v. Synthes (USA),* 1998 WL 954611, at *6 (E.D. Pa. Dec. 11, 1998), *aff'd*, 204 F.3d 494 (3d Cir. 2000). Because Defendant has offered a legitimate, non-discriminatory reason for Plaintiff's termination, the Court will proceed to the pretext prong of the *McDonnell Douglas* burden-shifting framework.

### 4. Pretext

The relevant question for the pretext inquiry is whether a reasonable jury could disbelieve Defendant's proffered reason or believe that an invidious discriminatory reason was more likely than not a determinative cause of Plaintiff's termination. *See Fuentes*, 32 F.3d at 764. Here, Defendant states that "Ms. Powell is unable to show that Boscov's reason for terminating her employment was pretext for disability discrimination." (Doc. 19 at

32.) Specifically, Defendant contends that "Ms. Powell is unable to establish any evidence beyond her subjective belief that her disability played a role in the decision to terminate her employment." (*Id.*)

As the Court has noted, *supra*, there is sufficient evidence in the record for a reasonable jury to (1) disbelieve the employer's reason for termination and (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions. *See Burton v. Teleflex, Inc.*, 707 F. 3d 417, 426 (3d Cir. 2013). First, Plaintiff has offered evidence that Defendant's alleged lifting, pushing, and pulling requirements were not an essential function of her job, casting doubt on Defendant's explanation that Plaintiff was terminated because she was out on leave for over six months because she could not perform her essential job duties. (*See, e.g.,* Powell Dep. at 81:20-25; 150:20-151:9; 152:14-153:5) (Powell testifying that it was uncommon for her to lift anything of significant weight on her own.) Plaintiff has also pointed to evidence in the record that could cause a reasonable jury to believe that Defendant did not engage in a good faith effort to discuss Powell's requests for accommodations with her. (*See, e.g.*, Martinez Dep. at 24:5-22; Marko Dep. at 65:23-67:21.) The Court finds that there is sufficient evidence in the record for Plaintiff to show that Defendant's legitimate, non-discriminatory reason for terminating Plaintiff was pretextual. Therefore, summary judgment will be denied with respect to Plaintiff's ADA and PHRA disparate treatment discrimination claims.

**2. Failure to Accommodate**

Defendant also moves for summary judgment on Plaintiff's failure to accommodate

claims. (Doc. 19 at 19.) "A disabled employee may establish a prima facie case under the

ADA if she shows that she can perform the essential function of the job with reasonable

accommodation and that the employer refused to make such an accommodation." *Turner,*

440 F.3d at 610 (citing *Skerski,* 257 F.3d at 284. "[T]he failure to reasonably accommodate

a disabled and qualified employee constitutes an adverse employment action for purposes

of the ADA." *Turner,* 440 F.3d at 611, n. 4; *see also Williams v. Philadelphia Hous. Auth.*

*Police Dep't,* 380 F.3d 751, 771 (3d Cir. 2004) ("[A] failure to make a reasonable

accommodation for a disabled and qualified employee constitutes discrimination under the

ADA."). "Generally, the question of whether a proposed accommodation is reasonable is a

question of fact." *Buskirk v. Apollo Metals,* 307 F.3d 160, 170 (3d Cir. 2002). "A claim that

an employer failed to accommodate an employee's disability is best viewed not as an

independent claim under the ADA, but as a theory that may support a discrimination claim."

*Kessler v. AT&T*, 2015 WL 5598866, at *9 (M.D. Pa. Sept. 22, 2015) (quoting *Solomon v.*

*Sch. Dist. of Phila.*, 882 F.Supp.2d 766, 776 (E.D. Pa. 2012)).

"A plaintiff bringing an ADA failure-to-accommodate claim must establish: (1) [s]he

was disabled and h[er] employer knew it; (2) [s]he requested an accommodation or

assistance; (3) h[er] employer did not make a good faith effort to assist; and (4) [she] could

have been reasonably accommodated." *Capps v. Mondelez Glob., LLC,* 847 F.3d 144, 157

(3d Cir. 2017) (quoting *Armstrong v. Burdette Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)). With respect to Plaintiff's failure to accommodate claims, Defendant does not dispute the first two elements, and only contends that "Boscov's made a good faith effort to assist and did in fact provide her with reasonable accommodation." (Doc. 19 at 20.)

The ADA does not define the term "reasonable accommodation" with much precision. *See* 42 U.S.C. § 12111(9). The Equal Employment Opportunity Commission, however, has promulgated regulations that define "reasonable accommodation" to include "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

Reasonable accommodation "includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith under what has been termed a duty to engage in the 'interactive process.'" *Williams,* 380 F.3d at 761. "Once an accommodation is requested, the employer is required to engage in the interactive process during which the employer and employee identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome them." *Bielich v. Johnson & Johnson, Inc.*, 6 F. Supp. 3d 589, 617 (W.D. Pa. 2014); *Armstrong*, 438 F.3d at 246 ("if an employer has adequate notice of an employee's disability, and the employee requests accommodations for the disability, it becomes the responsibility of the employer to

40

engage the employee in the interactive process of finding accommodations"); *see also* 29

C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be

necessary for the [employer] to initiate an informal, interactive process with the individual

with a disability in need of the accommodation. This process should identify the precise

limitations resulting from the disability and potential reasonable accommodations that could

overcome those limitations."). More specifically:

> The interactive process is aimed at determining what reasonable
> accommodations, if any, can address the employee's disability. The interactive
> process requires a great deal of communication between the employee and the
> employer, as both parties bear responsibility for determining what
> accommodation is necessary. Employers can show their good faith in a number
> of ways, such as taking steps like the following: meet with the employee who
> requests an accommodation, request information about the condition and what
> limitations the employee has, ask the employee what he or she specifically
> wants, show some sign of having considered employee's request, and offer
> and discuss available alternatives when the request is too burdensome A
> failure to communicate, either by way of initiation or response, may be an act
> of bad faith.

*Sharbaugh v. W. Haven Manor, LP*, No. CV 14-1723, 2016 WL 6834613, at *9 (W.D. Pa.

Nov. 21, 2016) (internal quotations and citations omitted).

The interactive process is a means to an end, and a defendant is not liable under the

ADA for failure to engage in the interactive process if the plaintiff obtained a reasonable

accommodation. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000)

(holding that there is no stand-alone claim for "failure to engage in an interactive process"

under the ADA; plaintiff must also allege that defendant failed to provide a reasonable

accommodation); *Wilson v. Dollar Gen. Corp.,* 717 F.3d 337, 347 (4th Cir. 2013) (same);

*Lowe v. Indep. Sch. Dist. No. 1 of Logan Cty.,* 363 Fed.Appx. 548, 552 (10th Cir. 2010);

*Ravel v. Hewlett-Packard Enter., Inc.*, 228 F. Supp. 3d 1086, 1097 (E.D. Cal. 2017).

Here, there is a genuine dispute of material fact as to whether Defendant offered

Plaintiff a reasonable accommodation once Plaintiff was arguably able to perform the

essential functions of her job following the receipt of her December 17, 2019, doctor's note

permitting her to return to work subject to certain restrictions.[11] (*See* SOF ¶ 44; RSOF ¶ 44.)

There is also sufficient evidence to create a genuine dispute of material fact as to whether

Defendant made a good faith effort to assist. First, the Court has determined, *supra*, that

there is a material issue of fact as to whether Defendant's alleged requirement of lifting,

pushing, and pulling up to 50 pounds were essential functions of the job. (*See, e.g.,* Doc.

22-3; Powell Dep. at 81:10-25; 150:20-151:9; 152:14-153:5.) Because there is a genuine

dispute of fact as to whether Defendant's lifting requirement was an essential function of

Plaintiff's job, there is also a genuine dispute of fact as to whether Defendant may have

been able to reasonably accommodate Plaintiff's requests to return to work despite there

being a "marginal," 29 C.F.R. § 1630.2(n)(1), but not necessarily essential, responsibility to

lift up to 50 pounds. Although "an employer is not obligated to provide an employee the

accommodation he requests or prefers," *Yovtcheva v. City of Philadelphia Water Dep't*, 518

---

[11] The parties do not dispute that Plaintiff's December 10, 2019 doctor's note stating that Plaintiff should be sitting 90% of the time would prevented her from performing the essential functions of her job. However, the parties do dispute whether Plaintiff's December 13, 2019 doctor's note—and the notes that follow—would permit her to perform the essential functions of her job with or without a reasonable accommodation.

Fed. App'x 116, 122 (3d Cir. 2013), there is a dispute as to whether Defendant's continued

mandatory placement of Plaintiff on medical leave following her December 13, 2019 note

and requests to return to work was a *reasonable* accommodation under the ADA. By

continuing to involuntarily place Plaintiff on an indefinite medical leave, Plaintiff would

inevitably run up against Defendant's policy of generally terminating employees after six

months of being out on medical leave. As Plaintiff notes, Plaintiff may have hoped to

"compete with the other department managers for the new consolidated positions" following

the reopening of her store. (*See* Doc. 22 at n.12.) Additionally, although Plaintiff was offered

workers' compensation for her medical leave, this compensation did not amount to the pay

she would have received had she been permitted to work. By rejecting Plaintiff's reasonable

requests to return to work beginning on December 13, 2019, a reasonable jury could

conclude that Defendant inevitably forced Plaintiff to be terminated through its six months of

leave policy and deprived her of various benefits of her employment along the way.

Therefore, the Court concludes that there is a genuine dispute of material fact as to where

Defendant provided Plaintiff a "reasonable accommodation" by requiring her to stay on

medical leave following her December 13, 2019 doctor's note that permitted her to work with

certain restrictions. *See Williams,* 380 F.3d at 761; *Bielich*, 6 F. Supp. 3d at 617.

The testimony of various managerial and human relations employees at Boscov's,

paired with Plaintiff's testimony, offers additional evidence that Defendant may have failed

to engage in a good faith interactive process with Plaintiff to determine what reasonable

Case 3:22-cv-01045-RDM   Document 26   Filed 02/16/24   Page 44 of 65

accommodations may be offered. In her deposition testimony, Martinez indicated that she

did not have any contact with Plaintiff about her requests to return to work, and that it was

the responsibility of the Human Resource Manager to communicate with employees:

> Q. Okay. Do you ever contact -- say that you get an update from Travelers with a restriction and the restriction limits something that's in that job description. Do you ever call the employee or talk to them about it?
>
> A. No. No.
>
> Q. Does anyone from Boscov's?
>
> A. The contact with the employee would be between them and their Human Resources Manager.
>
> Q. Okay. Is it -- is that contact the Human Resource Manager just informing them that it was determined that they couldn't come, you know, they couldn't come back to work because of the restrictions?
>
> A. That could be, yes.
>
> Q. Okay.
>
> A. I mean there could be other things as well but that would be the main.

(Martinez Dep. at 24:5-22.)

Despite Martinez's testimony indicating that communications relating to medical

restrictions would be between the employee and their Human Resources Manager, Marko—

Plaintiff's Human Resources Manager—stated that these decisions and communications

would be handled by risk management and Travelers Insurance Company:

> Q. So if she came in, handed you the document, said I'd like to return to work with these restrictions, what would you say to her?

A. I could not return her to work without first getting permission to do so from risk management.

Q. Okay. So then you scan the documents over to risk management. Do you call them?

A. I actually -- it's through an e-mail.

Q. Okay.

A. And then I may have received phone calls from Ms. Martinez.

Q. Right. And, you know, assuming risk management determined she couldn't come back, did you let Jackie know that that was their determination?

A. On the occasions, yes, but most of the time, as far as to my knowledge, that would be handled by Travelers Insurance Company.

Q. Okay. So was risk management -- they would also pass that along to Travelers, and then Travelers would reach out to Jackie?

A. As far as to my knowledge, that's the way it should work, yes.

Q. Okay. So you pretty much just relied on what risk management said with regard –

A. That is -- that is correct, yes.

Q. Okay. So you never met with Jackie and discussed, you know, whether there was a way to bring her back during this time?

A. The only conversation – the last conversation I had with Ms. Powell, to the best of my recollection, was she asked me if we had any open positions in the store. And from the restructuring after the pandemic, we did not have any open regular positions. And I said the only positions that we had were seasonal positions. That's all.

(Marko Dep. at 65:23-67:21.)

Martinez, who is alleged to have taken part in the decision to terminate Plaintiff (SOF

¶¶ 72-73; Doc. 22 at 19-20), also testified that she did not inquire into the status of Plaintiff's

condition, nor did she know that Plaintiff was attempting to return to work:

> Q. [...] For Ms. Powell do you remember ever contacting a Travelers' nurse about her condition, asking for a clarification on her restrictions?
>
> A. I don't remember. I don't recall that.
>
> Q. Okay. Do you know if Ms. Powell requested to return to work at any point?
>
> A. Not that I'm aware of.

(Martinez Dep. at 14.)

Additionally, Martinez provided testimony that Defendant enforced a "no canes"

policy:

> Q. You see this restriction, would you ask the employee or their medical provider whether, you know, what they can do with a cane or you're assuming they can't do those physical activities?
>
> A. Well, if you're looking at the restriction itself, it says must use assistive device.
>
> Q. Right.
>
> A. So based on that, that would be enough for us to say we can't accommodate.

(Martinez Dep. at 52:2-10.)

Plaintiff corroborated Martinez's characterization of the "no cane" policy, stating that

Marko also told Plaintiff that she could not work with a cane:

> Q. Hold on. What do you understand about the cane? You would agree that you could not work as a department manager with a cane?

A. Right. I was told you can't work with a cane.

Q. Right. And do you agree with that?

A. I still think I could have. I worked with the cane after I got hurt. And then when they saw that I had a cane, John Marko told me you can't work with a cane.

Q. And did he indicate why you can't work with a cane? A. No, he did not. He just told me I couldn't work with a cane.

(Powell Dep. at 97:18-98:6.)

Plaintiff also summarized these decisions on the part of Martinez, Marko, and

Defendant as stifling her proposed accommodations and requests to return to work:

Q. What did [Marko] do to you that you believe was wrong?

A. He should have allowed me to come back to work, period.

Q. Regardless of your restrictions?

A. With my restrictions. What I was asking for was very small. And did I have answers for putting dishes on the top shelf? Absolutely positively. I feel he did not bring me back because it was a liability.

Q. Did anyone say that to you?

A. It's the way it made me feel. It's the way through talking. No, he did not use those words. He did not say you're a liability.

Q. That's your supposition?

A. Exactly. That's how I felt. Absolutely. There was no reason, none, that they did not bring me back to work. My requests were very simple, very simple, and they could have absolutely positively accommodated.

(Powell Dep. at 142:13-143:7.)

This testimony presents a material dispute of fact as to whether Defendant engaged in a good faith interactive process with Plaintiff to determine what reasonable accommodations might be possible.

Additionally, for the reasons explained, *supra*, Defendant's argument that summary judgment is warranted because it placed Plaintiff on a continuous leave of absence is without merit. The Court notes that whether an accommodation was reasonable is typically a question of fact to be decided by a jury. *See Buskirk,* 307 F.3d at 170. Plaintiff's evidence that lifting up to 50 pounds may not have been an essential job function provides a sufficient basis for a reasonable jury to conclude that Defendant could have permitted Plaintiff's post-leave status quo to remain by allowing for Plaintiff's fellow employees to assist with lifting the few items that Plaintiff would have had trouble lifting on her own. (*See* Def. Ex. A, Powell Dep., Doc. 18-1 at 81:10-25; 150:20-151:9; 152:14-153:5.) Despite Plaintiff making multiple requests to return to work with few accommodations, Defendant continued to require Plaintiff to remain on medical leave.

A reasonable factfinder could conclude that once Plaintiff received doctor's notes allowing for her to return to work with restrictions that arguably did not impact her essential job duties, the involuntary placement of Plaintiff on medical leave became an unreasonable accommodation. *Compare to Shaner v. Synthes*, 204 F.3d 494, 507 (3d Cir. 2000).[12]

---

[12] Defendant references *Shaner* as supporting its proposition that its termination of Plaintiff following her being out on six months of leave was permissible. (*See* Doc. 19 at 31.) The facts in *Shaner* are clearly distinguishable from those found here. In *Shaner*, the Third Circuit acknowledged that the

Therefore, because Plaintiff has offered evidence for a reasonable jury to conclude that

Defendant did not engage in a good faith, interactive process with Plaintiff and that Plaintiff

could have been reasonably accommodated, summary judgment will be denied on Plaintiff's

failure to accommodate theory of liability.

### B.  COUNT I: FAILURE TO MAINTAIN CONFIDENTIAL MEDICAL RECORDS CLAIM

Defendant argues that Plaintiff's "claim for an alleged failure to maintain confidential

medical records fail as there exists no evidence that Boscov's did not maintain confidential

medical records and Ms. Powell has suffered no injury as a result of the alleged violation."

(Doc. 19 at 34.) In her Complaint, Plaintiff alleges that "Defendant failed to maintain

information it received from Plaintiff as confidential medical records, stored separately from

Plaintiff's personnel files, in violation of the ADA." (Compl. ¶ 62.) In response to Defendant's

Motion for Summary Judgment, Plaintiff argues that "[t]here is sufficient evidence in the

record that Defendant failed to maintain confidential medical information about Plaintiff's

---

"company made substantial efforts to accommodate" plaintiff in between his medical leave-of-absences as he was permitted to return to work. *Shaner*, 204 F.3d at 507. The Third Circuit accordingly affirmed the district court's grant of summary judgment with respect to Plaintiff's ADA claims. Here, Defendant offers no evidence to suggest that it made "substantial efforts to accommodate" Plaintiff by allowing her to return to work. Rather, the evidence strongly suggests that Defendant continuously and automatically declined to allow Plaintiff to return to work with little discussion over what accommodations might be possible to allow Plaintiff to return to work. Defendant did so despite the fact that Plaintiff's doctor's notes showed a decrease in Plaintiff's work restrictions over the course of the seven months that she was on leave. (*See* Doc. 22-6) Therefore, the Court concludes that a reasonable jury could conclude that Defendant's continual rejection of Plaintiff's requests to return to work and involuntary placement on medical leave amounted to the medical leave being an unreasonable accommodation.

ability to perform her job, presenting a genuine dispute for trial." (Doc. 22 at 43.) For the reasons explained below, the Court will grant summary judgment on this claim.

42 U.S.C. § 12112(d)(3)(B) & (d)(4)(C) "requir[es] that medical records be kept separately from nonconfidential information, and that access to confidential files be limited." *Tice v. Ctr. Area Transp. Auth.,* 247 F.3d 506, 519 (3d Cir. 2001). Here, Plaintiff alleges that "[t]here is evidence in the record showing Plaintiff suffered an injury due to Defendant's failure to maintain her medical records." (Doc. 22 at 44.) Plaintiff argues that Defendant's medical file for Plaintiff, which it turned over during discovery, only contained certain doctor's notes, while not producing others. (*Id.* at 43.) Plaintiff contends that she suffered because "Marko failed to relay Plaintiff's requests for accommodation to Ms. Martinez and Defendant ultimately failed to consider Plaintiff's requests and failed to accommodate her," resulting in emotional injury. (*Id.* at 44-45.)

The Court first notes that Plaintiff fails to cite to any caselaw suggesting that a mere failure to turn over doctor's notes during discovery is a sufficient basis to make out a claim under § 12112(d). Defendant's alleged failure to produce doctor's notes in the course of discovery does not offer an evidentiary basis to conclude that Defendant failed to maintain Plaintiff's medical records "on separate forms and in separate medical files [or that Defendant failed to treat Plaintiff's records] as a confidential medical record." 42 U.S.C. § 12112(d)(3)(B), (4)(C). Indeed, Plaintiff does not dispute that Defendant "keeps a physical medical file on every employee that is kept separate from the employee's personnel file" or

that "the medical files are kept in the store's Human Resources office in a separate filing

cabinet apart from employee personnel files." (SOF ¶¶ 95, 96; RSOF ¶ 95, 96; Marko Dep.

at 98:21 – 99:18.) Thus, Plaintiff's claims appear entirely speculative as to the reason

behind Defendant's failure to produce all of Plaintiff's notes during discovery.

Additionally, Plaintiff fails to allege a sufficient injury to make out a claim under §

12112(d). The Third Circuit has addressed "failure to maintain records" claims and the

standard required to make out a showing of injury:

> Other courts of appeals have addressed the question whether a plaintiff has a
> cause of action for a violation of § 12112(d) without demonstrating the
> existence of an injury-in-fact, either through actual damage (emotional,
> pecuniary, or otherwise), or through the presence of a continuing illegal practice
> to which plaintiff is likely to be subject absent court intervention. All have
> concluded that a violation of § 12112(d), without such a showing, presents no
> "injury" capable of remedy, and thus affords no basis for suit. *See Cossette v.
> Minnesota Power & Light*, 188 F.3d 964, 971 (8th Cir.1999) (remanding for a
> determination as to whether the improper medical inquiry caused a "tangible
> injury" capable of supporting the suit); *Armstrong v. Turner Indus., Inc.*, 141
> F.3d 554, 562–63 (5th Cir.1998) (dismissing a claim for damages from an
> allegedly improper medical examination for lack of cognizable injury; no
> standing for injunctive relief because, despite the presence of continuing
> employer violations, there was no allegation that this particular plaintiff would
> again be subject to examination); *cf. Griffin v. Steeltek, Inc.,* 160 F.3d 591, 595
> (10th Cir.1998) (permitting a nondisabled plaintiff to sue for improper medical
> inquiry because the plaintiff alleged that revelations elicited via the inquiries
> had caused employer to refuse to hire him, thus resulting in an injury-in-fact).
> We ally ourselves with these holdings.
>
> Beyond the bare allegations of "mental/emotional distress, mental anguish,
> stress and inconvenience" set forth in his initial complaint, Tice has submitted
> no evidence as to the actual existence of such harms as a result of CATA's
> ADA violations. Indeed, he has not even identified a single person who
> improperly viewed his medical files. As the Fifth Circuit has stated in the context
> of preemployment examinations and inquiries, there is no indication in either

the text of the ADA or in its history that a technical violation of § 12112(d) was intended to give rise to damages liability. *See Armstrong,* 141 F.3d at 561. Therefore, we hold that Tice may not maintain his suit against his employer on the ground of improper recordkeeping.

*Tice,* 247 F.3d at 519–20.

Here, although evidence of Defendant's alleged failure to consider all of Plaintiff's doctor's notes could be considered as evidence of antagonism with respect to Plaintiff's disparate treatment, failure to accommodate, and retaliation claims, Plaintiff does not allege any tangible harm created by Defendant's alleged failure to maintain her doctor's notes.[13] Instead, Plaintiff only makes "the bare allegations of 'mental/emotional distress, mental anguish, stress and inconvenience,'" *Tice,* 247 F.3d at 519. Therefore, the Court will grant summary judgment in favor of Defendant as to Plaintiff's Failure to Maintain Confidential Medical Records claim (Compl. ¶ 62).

## C. COUNT I AND II: PLAINTIFF'S ADA AND PHRA RETALIATION CLAIMS

Defendant contends that it is entitled to summary judgment with respect to Plaintiff's claims of retaliation. (Doc. 19 at 36.) Specifically, Defendant "dispute[s] that Mr. Powell is able to establish any causal connection to support a retaliation claim." (*Id.*) In the absence

---

[13] Plaintiff argues that she suffered an injury as a result of Defendant's alleged failure to maintain her medical records because "Marko failed to relay Plaintiff's requests for accommodation to Ms. Martinez and Defendant ultimately failed to consider Plaintiffs' requests and failed to accommodate her." (Doc. 22 at 43.) The Court finds that Plaintiff fails to provide any evidence or facts to suggest that it was Defendant's alleged failure to maintain records that resulted in Defendant not relaying Plaintiff's requests for accommodation to Boscov's claims department. Indeed, even in instances where Marko *was* aware of Plaintiff's requests for accommodation, he did not relay those requests directly to Martinez. (Martinez Dep. at 14.) Therefore, Plaintiff's argument is entirely speculative and she fails to allege a sufficient injury to make out a claim under § 12112(d).

of direct evidence of retaliation, retaliation claims […] typically proceed under the *McDonnell Douglas* framework. *Fasold v. Just.*, 409 F.3d 178, 188 (3d Cir. 2005). Thus, if the plaintiff satisfies the prima facie elements of a retaliation claim, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct." *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006). If the employer does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (citation omitted).

## 1. Retaliation: Prima Facie Case

Defendant argues that Plaintiff fails to make out a prima facie case of retaliation. (Doc. 19 at 36-37.) Under the ADA, employers are prohibited from retaliating against their employees for requesting accommodations for disabilities. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010). "To establish a prima facie case of unlawful retaliation in violation of the ADA, a plaintiff must show that he engaged in protected activity, that he suffered adverse action either after or contemporaneous with the protected activity, and that there was a causal connection between the employee's protected activity and the employer's adverse action." *Canevari v. Itoh Denki U.S.A., Inc.,* No. 3:15-CV-1449, 2017 WL 4080548, at *13 (M.D. Pa. July 24, 2017), *report and recommendation adopted*, No. 3:15-CV-1449, 2017 WL 4077394 (M.D. Pa. Sept. 14, 2017) "An employee engages in protected activity when he requests a reasonable accommodation for his disability under [ ] the ADA [ ]." *Id.* (citation omitted).

With respect to Plaintiff's retaliation claims, Defendant does not dispute that Plaintiff

was engaged in protected activity and that there was an adverse employment action by

Defendant. (Doc. 19 at 36.) Defendant only disputes that Plaintiff is able to establish a

causal connection to support a retaliation claim. (*Id.*) Courts in the Third Circuit have been

clear that

> [i]n order to satisfy the third prong of the prima facie case for retaliation under
> the ADA, plaintiff must show a "causal link" between the protected activity and
> the adverse employment decision. *LeBoon v. Lancaster Jewish Cmty. Cty.
> Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). Courts look to "a broad array of
> evidence" to determine causation, including "temporal proximity," "intervening
> antagonism or retaliatory animus, inconsistencies in the employer's articulated
> reasons for terminating the employee, or any other evidence in the record
> sufficient to support the inference of retaliatory animus." *Id.* "[A] gap of three
> months between the protected activity and the adverse action, without more,
> cannot create an inference of causation and defeat summary judgment." *Id.* at
> 233.

*Gavurnik v. Home Properties, L.P.,* 227 F. Supp. 3d 410, 420-21 (E.D. Pa.), *aff'd,* 712 F.

App'x 170 (3d Cir. 2017).

In determining whether there is a causal connection between the protected conduct

and the adverse employment action, "courts have typically analyzed whether there is

temporal proximity between the protected activity and the adverse action, or whether there

is a pattern of antagonism by the employer in response to the protected activity." *Long v.

Spalding Automotive Inc.*, 337 F.Supp.3d 485, 491 (E.D. Pa. 2018) (citation omitted);

*Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir. 1997) ("Our cases have

established that temporal proximity between the protected activity and the termination is

sufficient to establish a causal link.") The Third Circuit has explained the relevant standard

for finding causation in retaliation cases:

> We have recognized, to be sure, that a suggestive temporal proximity between the protected activity and the alleged retaliatory action can be probative of causation. *See Rauser v. Horn,* 241 F.3d 330, 334 (3d Cir.2001). However, "[e]ven if timing alone could ever be sufficient to establish a causal link, ... the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Estate of Smith v. Marasco,* 318 F.3d 497, 512 (3d Cir.2003) (internal quotations omitted; alterations in original); *see also Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989) (two days between protected activity and alleged retaliation sufficient to draw inference of causal connection). In cases such as this one where "the temporal proximity is not so close as to be unduly suggestive," we have recognized that "timing plus other evidence may be an appropriate test...." *Marasco,* 318 F.3d at 513 (internal quotations omitted).

*Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003).

In some instances, the Third Circuit has also viewed the start date of an alleged

protected activity as being relevant in determining whether there is unduly suggestive

temporary proximity between the protected activity and the alleged retaliatory action. *See,*

*e.g., Holmes-Mergucz v. Cellco P'ship*, No. 21-2617, 2022 WL 16545589, at *1 (3d Cir.

2022) ("At step one, her prima facie case fails for lack of causation. Her firing came two

months after her last request to extend her disability accommodation. That was not

suspiciously close in time, particularly because her first request came more than a year

earlier.")

Plaintiff claims that "there is highly suspicious timing between Plaintiff's July 2, 2020

request to return to work and Defendant's decision to terminate Plaintiff on July 6, 2020."

(Doc. 22 at 35.) Although the Court notes that Plaintiff first requested to return to work with accommodations seven months earlier on December 13, 2019, the July 2, 2020 request was *itself* a distinct protected activity that was sufficiently close in timing to Plaintiff's July 6, 2020 termination to be unduly suggestive of retaliatory motive.[14]

Assuming, *arguendo,* that the timing alone was not unduly suggestive, the Court finds that there is sufficient evidence in the record to support an inference of retaliatory animus. Much of the evidence discussed with respect to Plaintiff's discrimination claims, *supra*, also provides support for there being a genuine dispute of fact as to whether Defendant retaliated against Plaintiff's requests for accommodations. First, there is evidence in the record that Defendant offered inconsistent explanations for terminating Plaintiff. (*See* Marko Dep. at 42:22-43:14, 106:21-107:19; Doc. 22-12 at 2; Powell Dep. at 153:10-22; SOF ¶ 73.) Additionally, there is evidence to suggest that Defendant refused to engage in a good faith interactive discussion with Plaintiff regarding accommodation options. (*See* Martinez Dep. at 14, 24:5-22, 52:2-10; Marko Dep. at 65:23-67:21; Powell

---

[14] Defendant argues that Plaintiff's July 2, 2020, request for accommodation should not be viewed as an independent protected activity, because the "continuing violation" theory does not apply. (*See* Doc. 19 at 39.) Defendant misconstrues the Third Circuit's holding in *Aubrey v. City of Bethlehem*, 466 Fed. Appx. 88, 92 (3d Cir. 2012). In *Aubrey*, the Third Circuit only rejected the use of the "continuing violation" doctrine to preserve *time barred* claims for discrete discriminatory acts, and did not address whether separate requests for accommodation are viewed as independent instances of protected activity in the context of ADA retaliation claims. *See, e.g., Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91 (1st Cir. 2007) (holding that requesting an accommodation is protected conduct for purposes of the ADA's retaliation provision.) It would be anomalous for the Court to find that all requests for accommodation after the first request are foreclosed from being protected activity merely because Plaintiff had made a prior request for accommodation. The Court finds that the July 2, 2020 request was an independent instance of Plaintiff engaging in protected activity.

Dep. at 97:18-98:6.) Such an alleged failure to engage with Plaintiff regarding her options for feasible accommodations could lead a reasonable jury to conclude that, instead of working with Plaintiff in accommodating her disability, Defendant opted to involuntarily place her on an indefinite leave and eventually terminate her employment.

The above evidence, paired with the unduly suggestive timing between Plaintiff's July 2, 2020 request to return to work and July 6, 2020 termination, is sufficient to find that Plaintiff has alleged a prima facie case of retaliation. Therefore, the Court will proceed to the second prong of the *McDonnell Douglas* analysis.

## 2. Retaliation: Legitimate, Non-Discriminatory Reason

Defendant argues that, even if Plaintiff sufficiently alleges a prima facie case of retaliation, it has offered a legitimate non-retaliatory explanation for its decision to terminate Plaintiff. (*See* Doc. 19 at 41.) Here, Defendant, as it did with respect to Plaintiff's discrimination claims, contends that its decision not to permit Ms. Powell to return to work was "due to her medical restrictions" and its decision to terminate Plaintiff was because "she remained on a leave of absence for more than six months with no reasonable expected return to work date." (Doc. 19 at 41.) Because the Court finds that this is a legitimate, non-discriminatory reason for Plaintiff's termination, the Court will proceed to the pretext prong of the *McDonnell Douglas* framework.

**3. Retaliation: Pretext**

Once the employer has offered a legitimate reason for the adverse employment decision, the plaintiff must point to evidence that either: (1) casts doubt on the employer's "articulated legitimate reasons" or (2) demonstrates that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994). Because Defendant again references the same legitimate, non-discriminatory reason for its termination of Plaintiff that it uses with respect to Plaintiff's discrimination claims, the Court's analysis is also the same here. The Court finds that because there is evidence creating a genuine dispute of material fact as to whether lifting, pushing, and pulling up to fifty (50) pounds were essential job functions (Doc. 22-3; Powell Dep., at 81:10-25, 114:25-115:13, 150:20-151:9; 152:14-153:5), this evidence also casts doubt on Defendant's articulated reason for placing Plaintiff on leave and eventually terminating Plaintiff due to being out on leave. Indeed, if lifting up to fifty (50) pounds was not an essential job function, Defendant may have had little justification for declining to accommodate her and for involuntarily placing Plaintiff on leave and eventually terminating her employment because of her extended leave. Therefore, a reasonable jury could find that evidence that Defendant's lifting duties were non-essential casts doubt on Defendant's stated reason for terminating Plaintiff.

Additionally, examining whether "retaliation was the real reason for the adverse employment action," *Moore*, 461 F.3d at 342, as the Court discusses with respect to

Plaintiff's discrimination claims, *supra*, there is other evidence in the record that a jury could find reveals a retaliatory reason for terminating Plaintiff's employment. Evidence that the Defendant refused to engage in a good faith interactive process to determine whether accommodations would be possible could suggest a retaliatory motive for Defendant's decision to terminate Plaintiff. (*See* Martinez Dep. at 14, 24:5-22, 52:2-10; Marko Dep. at 65:23-67:21; Powell Dep. at 97:18-98:6.) Defendant's varying explanations for terminating Plaintiff may also be used to suggest that Defendant's decision to terminate Plaintiff was retaliatory. (*See, e.g.,* Marko Dep. at 42:22-43:14, 106:21-107:19; Doc. 22-12 at 2; Powell Dep. at 153:10-22.) Therefore, because there is a genuine dispute of material fact as to whether Plaintiff was retaliated against for her requests for accommodation, summary judgment will accordingly be denied on this claim.

### D. COUNT III: PLAINTIFF'S STATE LAW WRONGFUL DISCHARGE CLAIM

Defendant contends that it is entitled to summary judgment on Plaintiff's state law wrongful discharge claim (Count III). Specifically, Defendant argues that Plaintiff "fails to establish a *prima facie* case of wrongful termination under Pennsylvania law" and that summary judgment should be granted on this claim. (Doc. 19 at 41-42.)

In Pennsylvania, an employer may discharge an at-will employee for any reason whatsoever, subject to a few narrow exceptions. *Weaver v. Harpster*, 601 Pa. 488, 496, 975 A.2d 555, 560 (2009). An employee may bring a cause of action for a termination of at-will employment "only in the most limited circumstances, where the termination implicates a

clear mandate of public policy." *Id.* at 563. Pennsylvania courts have recognized such a public policy exception to the at-will employee doctrine when an employee files an unemployment compensation claim.[15] *Weaver,* 975 A.2d at 564 (citing *Highhouse v. Avery Trans.,* 443 Pa. Super. 120, 660 A.2d 1374, 1378 (Pa. Super. Ct. 1995) ("if the ... employer discharged [Plaintiff] because [s]he had made a claim for unemployment compensation during a period when [s]he was not working and earning income, the discharge will constitute a violation of public policy and will support a tort claim for wrongful discharge.").

**1. Wrongful Discharge: Prima Facie Case**

To state a prima facie case for wrongful discharge, Plaintiff must show: "(1) [she] engaged in protected activity; (2) the employer took and adverse employment action against [her]; and (3) a causal link between the protected activity and the employer's adverse action." *Daniels v. Sch. Dist. Phila.,* 776 F.3d 181, 193 (3d Cir. 2015). If Plaintiff makes out a prima facie case, then Defendant may articulate a legitimate, non-discriminatory reason for its adverse employment action. (*Id.*) If the employer makes this showing, the burden shifts back to the plaintiff to prove pretext: that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." (*Id.*)

---

[15] "[T]he Pennsylvania Supreme Court held that a cause of action exists under Pennsylvania law for wrongful discharge of an employee who files a claim for workers' compensation benefits [and] [...] federal district courts in Pennsylvania have analogized this cause of action to a retaliatory discharge claim under Title VII", an approach the Third Circuit has approved. *Dunsmuir v. May Dept. Stores Co.,* 120 Fed. App'x. 927, 929 (3d Cir. 2005); *see also, e.g., Larochelle v. Wilmac Corporation,* 210 F. Supp. 3d 658, 714 (E.D. Pa. 2016).

Here, as with Plaintiff's other claims, Defendant "does not dispute that Plaintiff engaged in protected activity or that she suffered an adverse employment action" (Doc. 19 at 43) and argues only that Plaintiff "is unable to establish any causal link between her protected activity and her termination." (*Id.*) The Court notes that Plaintiff's initial request for workers' compensation benefits occurred on December 7, 2019, seven months prior to Plaintiff's July 6, 2020 termination (SOF ¶ 32; Doc. 22 at 35). Because of the seven-month gap between Plaintiff's request for workers' compensation and termination, temporal proximity alone cannot not establish a causal connection in this instance. *See McDannell v. Thos. Somerville Co.,* No. 1:07-CV-1821, 2009 WL 1585813, at *4 (M.D. Pa. June 3, 2009) (dismissing Plaintiff's claim for wrongful discharge because causation could not be established since more than two years passed since Plaintiff received workers' compensation and his termination); *Williams,* 380 F.3d at 760 (finding period over two months between employee's protected activity and his termination was not sufficient, by itself, to establish a causal connection); *Griesbaum v. Aventis Pharms.*, No. 3:CV-04-1726, 2006 WL 2796160, at *4 (M.D. Pa. Sept. 25, 2006), *aff'd,* 259 F. App'x 459 (3d Cir. 2007). Therefore, Plaintiff must present other evidence to show that the timing between Plaintiff's request for workers' compensation and termination was unduly suggestive.

As the Court has noted with respect to Plaintiff's discrimination and retaliation claims, *supra*, Plaintiff offers sufficient evidence to support a causal link between her request for workers' compensation benefits and her ultimate termination. First, Plaintiff's evidence that

Defendant declined to allow any of the employees out on workers' compensation to return to the store following the COVID store closure may be used as evidence that Defendant terminated Plaintiff for being out on workers' compensation. (Sheetz Dep. 97:11-17; Marko Dep. at 116:22-118:6.) Plaintiff also points to evidence suggesting that Defendant declined to engage in a good faith dialogue with Plaintiff regarding her requests for accommodation. (*See* Martinez Dep. at 14, 24:5-22, 52:2-10; Marko Dep. at 65:23-67:21; Powell Dep. at 97:18-98:6.) As Plaintiff notes, this evidence could lead a reasonable jury to conclude that "Plaintiff's requests for accommodation were not addressed and Plaintiff was ultimately terminated because she was receiving workers' compensation benefits." (Doc. 22 at 37.) Additionally, Plaintiff references the deposition testimony of Martinez to suggest that Defendant's policy of rewarding stores for not reporting workplace injuries is evidence of antagonism towards employees requesting workers' compensation:

> Q. Okay. Does the Risk Department sponsor or run any promotions where, you know, it rewards stores or employees who do not report workplace injuries?

> A. We have a program that we will, depending on how many days a store goes without an injury, when they get to a specific point then they would be given a luncheon or something to that effect for reaching a specific day. I don't know exactly how many days that would be but once they reach a certain goal then the store would be provided a lunch and possibly gift cards for them.

> Q. Okay. All right. But that comes from the Risk Department that luncheon or the gift cards?

> A. Yes. That's correct.

Q. Okay. And so basically the way it works is if a store doesn't report an injury for however long it is, say it's six months, they would be rewarded with some sort of incentive, the luncheon or the gift card?

A. That's correct.

(Doc. 18-4, Martinez Dep., at 36:10-37:4.)

Although the Court recognizes that this testimony would likely be viewed as a good faith attempt by Boscov's to incentivize workers to act safely while on the job, a reasonable jury could view Defendant's practice of rewarding stores for avoiding workplace injuries as also incentivizing employees to avoid reporting instances of workplace injury. Therefore, because Plaintiff has pointed to sufficient evidence to establish a prima facie case of wrongful discharge, the Court will proceed to the next phase of the *McDonnell Douglas* framework.

## 2. Wrongful Discharge: Legitimate, Non-Discriminatory Reason

As with Plaintiff's discrimination and retaliation claims, Defendant again contends that "Boscov's decision to terminate Ms. Powell's employment was based solely upon legitimate, non-discriminatory considerations." (Doc. 19 at 47.) Defendant, as it did with respect to Plaintiff's other claims, contends that its decision not to permit Ms. Powell to return to work was "due to her medical restrictions" and its decision to terminate Plaintiff was because "she remained on a leave of absence for more than six months with no reasonable expected return to work date." (Doc. 19 at 41.) Because the Court finds that

Defendant has offered a legitimate, non-discriminatory reason for Plaintiff's termination, the

Court will proceed to the pretext prong of the *McDonnell Douglas* framework.

## 3. Wrongful Discharge: Pretext

As the Court has noted, *supra*, there is sufficient evidence in the record to create a

genuine dispute of material fact as to whether lifting up to fifty (50) pounds was an essential

job function, thus casting doubt on Defendant's articulated reason for terminating Plaintiff.

(Powell Dep. at 81:10-25; 150:20-151:9; 152:14-153:5.) Indeed, if lifting, pushing, and

pulling up to fifty (50) pounds were not essential job functions, Defendant may have had

little justification for declining to accommodate her and for placing Plaintiff on leave and

eventually terminating her employment.

Additionally, as the Court explained with respect to Plaintiff's discrimination claims,

*supra*, there is other evidence in the record that a jury could conclude reveals an invidious

discriminatory or retaliatory motive for terminating Plaintiff's employment. (*See, e.g.,* Sheetz

Dep. at 97:11-17; Marko Dep. at 116:22-118:6) (testimony showing that Defendant did not

retain any of the employees who were out on medical leave following the COVID-19

shutdown.) Evidence that Defendant failed to engage in any good faith exchanges with

Plaintiff in an attempt to find an accommodation that would allow her to return to work also

supports Plaintiff's proposition that she was terminated in retaliation for going out on

worker's compensation. (*See* Martinez Dep. at 14, 24:5-22, 52:2-10; Marko Dep. at 65:23-

67:21; Powell Dep. at 97:18-98:6.) Therefore, because there are genuine disputes of

material fact as to whether Plaintiff was retaliated against for her requests for accommodation, summary judgment will be denied on this claim.

## V.  CONCLUSION

For the reasons discussed, summary judgment will be granted with respect to Plaintiff's claim contained within Count I of her Complaint that "Defendant failed to treat the medical information it received from Plaintiff as confidential medical records." (Doc. 1, Compl. ¶ 62.) The remainder of Defendant's Motion for Summary Judgement will be denied. An appropriate Order is filed simultaneously with this Memorandum Opinion. A trial will be scheduled to resolve all issues by separate Order.

Robert D. Mariani
United States District Judge